UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re Ex Parte Application of Frederick J.
Warren for an Order to Obtain Discovery for
Use in Foreign Proceedings Pursuant to 28
U.S.C. 1782,

                       Petitioners.

**MEMORANDUM**
**OPINION & ORDER**

20 Misc. 208 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        In a June 11, 2020 ex parte order, this Court granted Frederick J. Warren's

application for discovery pursuant to 28 U.S.C. § 1782.  See Dkt. No. 15.  Fintech Advisory Inc.

("Fintech") and Wilk Auslander LLP (together, "Movants") have moved for vacatur of the June

11, 2020 Order as to them.  For the reasons stated below, Movants' motion will be granted as to

Wilk Auslander but denied as to Fintech.

## BACKGROUND

        Warren is a U.S. citizen and a shareholder of Integradora de Servicios Petroleros

Oro Negro, S.A.P.I. de C.V. (together with its subsidiaries, "Oro Negro").  (Orta Decl. (Dkt. No.

4) ¶ 1)  Oro Negro is in the business of leasing oil rigs for offshore drilling.  (Statement of Claim

(Dkt. No. 4-1) ¶ 3)

        Oro Negro's "primary competitor" is Seamex, of which 50% is owned by Fintech,

and 50% is owned by non-party Seadrill Limited.  (Orta Decl. (Dkt. No. 4) ¶¶ 16, 20).  Wilk

Auslander is a New York-based law firm that represents Fintech and Seadrill in connection with

Oro Negro's Chapter 15 bankruptcy proceeding in this District.[1]  (Id.; see also January 14, 2019 Protective Order (Dkt. No. 24-4) at 16)[2]

On June 19, 2018, Warren and other U.S shareholders of Oro Negro brought an international arbitration against Mexico under the North American Free Trade Agreement ("NAFTA") and Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL").  (Orta Decl. (Dkt. No. 4) ¶¶ 1, 4, 13)  On October 7, 2019, the shareholders submitted a Statement of Claim alleging that Mexico had violated NAFTA by (1) "colluding with the Bondholders to deprive Oro Negro of the Rigs and the Oro Negro Contracts, and unjustly persecuting Oro Negro and its executives, including based on fabricated evidence"; (2) "colluding with the Bondholders to illegally terminate the Oro Negro Contracts and dispossess Oro Negro of its Rigs and retaliate for the NAFTA Arbitration and Oro Negro's U.S. lawsuits"; and (3) "indirectly expropriating the U.S. Shareholders' investment in Oro Negro by destroying the company without compensation."  (Id. ¶ 7)

According to the Statement of Claim, in March 2013, Oro Negro ordered the construction of four "state-of-the-art jack-up rigs used for offshore drilling" (the "New Rigs") based on a representation from Pemex – Mexico's state-owned oil company – that it would lease the New Rigs.  (Statement of Claim (Dkt. No. 4-1) ¶¶ 1, 70-72)  In 2014, Oro Negro raised $900 million to finance the acquisition of the New Rigs, issuing bonds to international investors.  (Id. ¶¶ 1, 6, 46-47)  Pemex later contracted for five rigs from Seamex – Oro Negro's primary competitor – on less favorable terms, however, while continuing to represent to Oro Negro that it

---

[1]  Wilk Auslander has also represented Seamex in the Chapter 15 proceeding.  In re Perforadora Oro Negro, S. de R.L. de C.V., No. 18-11094 (SCC), Oct. 23, 2018 Ltr. (Dkt. No. 123) (Bankr. S.D.N.Y. Oct. 23, 2018).
[2]  The page numbers referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

was interested in leasing the New Rigs.  (Id. ¶¶ 74-76)  Pemex ultimately did not lease any of the New Rigs, which drove Oro Negro into bankruptcy.  (Id. ¶¶ 75, 79)

        Between April 2013 and December 2015, Oro Negro's subsidiary Perforadora entered into contracts with a Pemex subsidiary to lease a number of older rigs to the Pemex subsidiary (the "Old Rigs").  (Id. ¶¶ 65-66)  In 2015, 2016, and 2017, Pemex amended its leases with Perforadora for the Old Rigs, making the terms less favorable for Perforadora.  (Id. ¶¶ 81-96)

        The Statement of Claim further alleges that in May 2017, the "Ad-Hoc Group" was formed by bondholders who collectively own approximately 60% of the bonds issued by Oro Negro in 2014.  (Id. ¶ 97)  Two members of the Ad-Hoc Group are owned or controlled by John Fredriksen, who owns or controls Seadrill, the 50% owner of Seamex.  (Id. ¶ 99)  The Ad-Hoc Group encouraged Pemex to force Perforadora to amend its leases, in order to ensure Oro Negro's default and allow the bondholders to foreclose on the Old Rigs.  (Id. ¶ 101)  Pemex "was motivated to retaliate against Oro Negro because Oro Negro had refused to participate in [the] bribery of Mexican and Pemex officials."  (Id. ¶ 100)  In March 2017, "Pemex threatened to cancel the [leases] and stopped paying what it owed to Perforadora, even though Pemex continued to use the [Old Rigs]."  (Id. ¶ 102)

        In September 2017, Oro Negro filed for bankruptcy protection in Mexico, and sought an injunction to prevent Pemex from terminating the leases.  (Id. ¶¶ 113-15)  On October 5, 2017, the bankruptcy court issued an injunction preventing Pemex from terminating the leases and ensuring that Perforadora would maintain possession of the Old Rigs during the bankruptcy proceeding.  (Id. ¶ 117)  On October 11, 2017 – three days after Perforadora informed the bankruptcy court that Pemex had attempted to terminate the leases –  the bankruptcy court issued

another order affirming its injunction.  (<u>Id.</u> ¶¶ 118-19)  Pemex moved for reconsideration, and on December 29, 2017, the bankruptcy court denied the motion.  Pemex challenged that order through a Mexican legal device called an "amparo," however, which remains pending, and which "has allowed Pemex to avoid complying with the December 29 Order since December 2017[,] [which] means that Pemex has not paid Oro Negro any day rates since October 3, 2017."  (<u>Id.</u> ¶ 120)

In April 2018, Oro Negro filed a Chapter 15 bankruptcy petition in this District seeking enforcement of the Mexican bankruptcy court orders in the U.S.   (Orta Decl. (Dkt. No. 4) ¶ 16)  The Chapter 15 proceeding was commenced through Oro Negro's Foreign Representative, who is represented by Quinn Emanuel Urquhart & Sullivan, LLP, which also serves as Warren's counsel.  (<u>See</u> Chapter 15 Pet. (Dkt. No. 24-3))  Oro Negro sought discovery concerning (1) the Oro Negro bondholders, (2) AMA Capital Partners, LLC ("AMA"), an agent of the Oro Negro bondholders, (3) Seamex, and (4) Seamex's co-owners, Seadrill and Movant Fintech.  (Orta Decl. (Dkt. No. 4) ¶ 16)  The Chapter 15 court granted the requested discovery in orders dated July 11, 2018, November 13, 2018, and December 21, 2018.  The discovery authorized by the court covered the following topics:  "Oro Negro, the Oro Negro Contracts and their amendments, the [Old Rigs], Seamex and the Mexican criminal investigations."  (<u>Id.</u> ¶¶ 17-18 & n.12)  On January 14, 2019, the Chapter 15 court entered a protective order (the "Protective Order") concerning the discovery authorized by its orders.  (Protective Order (Dkt. No. 24-4))

By May 15, 2019, Oro Negro had become illiquid and was unable to maintain the Old Rigs.  Accordingly, the Mexican bankruptcy court ordered Perforadora to turn over the Old Rigs to the bondholders.  (Statement of Claim (Dkt. No. 4-1) ¶ 145)  On June 12, 2019, the Mexican bankruptcy court declared Oro Negro in liquidation.  (<u>Id.</u> ¶ 146)

In June 2019, based on the Chapter 15 discovery, Oro Negro and Inegradora's former chief executive officer Gonzalo Gil-White filed suit in this District against the bondholders and certain of their agents, including AMA, Seadrill, and Fintech.  (Orta Decl. (Dkt. No. 4) ¶¶ 19, 20)  In September 2019, Oro Negro, Gil-White, and certain of Oro Negro's former officers and directors filed a second lawsuit against the bondholders in this District.  (Id. ¶¶ 21, 24)

On May 11, 2020, Warren filed an ex parte application for discovery pursuant to 28 U.S.C. § 1782.  (App. (Dkt. No. 1))  Warren seeks to obtain information from Movants regarding "(1) the Oro Negro Rigs; (2) the Oro Negro Contracts, their amendments and purported termination; (3) Oro Negro's Mexican Bankruptcy Proceeding; (4) contracts between Seamex and Pemex and any related amendments; and (5) the initiation of criminal complaints against Oro Negro and its management."  (Warren App. Br. (Dkt. No. 3) at 24)  According to Warren, NAFTA and UNCITRAL Arbitration Rules permit the use of any relevant information discovered in this Section 1782 proceeding.  (Orta Decl. (Dkt. No. 4) ¶ 13)  Warren seeks this information through Section 1782 because the NAFTA Tribunal "has jurisdiction over only parties to the arbitration:  here, the U.S. Shareholders of Oro Negro and Mexico."  (Id. ¶ 14)

On June 11, 2020, this Court granted Warren's ex parte application for an order pursuant to Section 1782 to obtain discovery from AMA, Fintech, and Wilk Auslander in connection with the NAFTA proceeding.  (Dkt. No. 15)

On June 12, 2020, Warren served subpoenas on Fintech and Wilk Auslander

through the New York Secretary of State.[3]  (Concannon Decl. (Dkt. No. 30) ¶¶ 7-11)  The

subpoenas require Movants to produce:

> (1)     All documents or communications regarding the [Old] Rigs, including
>          with Pemex or its agents.
>
> (2)     All documents or communications concerning the Oro Negro Contracts,
>          their amendments, including the 2015 and 2016 Amendments and the
>          2017 Proposed Amendments, and the Oro Negro Contract terminations,
>          including with Pemex or its agents.
>
> (3)     All documents and communications regarding Seamex, the contracts
>          between Seamex and Pemex, and their amendments.
>
> (4)     All documents or communications concerning the Mexican Bankruptcy
>          Proceeding.
>
> (5)     All documents or communications concerning the Mexican criminal
>          proceedings and/or the filing of any criminal complaint against Oro
>          Negro, its former employees, officers, directors, shareholders, or agents,
>          as well as any criminal proceeding México initiated against same,
>          including México's request for Interpol Red Notices.

(Fintech Doc. Subpoena (Dkt. No. 3-3) at 7-8; Wilk Auslander Doc. Subpoena (Dkt. No. 3-4) at

7-8)  The subpoenas also request depositions as to Fintech on substantially the same topics; and

as to Wilk Auslander on "[t]he scope of documents obtained from Seadrill in [Wilk Auslander's]

possession, custody or control" and "[t]he scope of document production made by [Wilk

Auslander] in response to the document subpoena issued in [t]his [Section] 1782 Proceeding."

(Fintech Dep. Subpoena (Dkt. No. 3-6) at 7; Wilk Auslander Dep. Subpoena (Dkt. No. 3-7) at 7)

On August 27, 2020, Movants filed the instant motion seeking vacatur of this

Court's June 11, 2020 Order.  (Dkt. No. 23)

---

[3]  Service was also effectuated by FedEx on June 15, 2020, and by personal delivery on July 20, 2020.  (Id. ¶¶ 12-13)  Movants concede that they became aware of this action by June 16, 2020. (Mov. Br. (Dkt. No. 25) at 14)

## DISCUSSION

I.     **DISCOVERY UNDER SECTION 1782(a)**

Section 1782(a) provides:

The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. . . . The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. . . . The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing.  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a).  "The statute authorizes district courts to grant such relief only where (1) the person from whom discovery is sought resides or is found in the district of the district court where the application is made; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by the foreign tribunal or 'any interested person.'"  In re OOO Promnefstroy, No. M 19-99 (RJS), 2009 WL 3335608, at *4 (S.D.N.Y. Oct. 15, 2009) (citing Schmitz v. Berstein Liebhard & Lifshitz, LLP, 376 F.3d 79, 83 (2d Cir. 2004)).

"'[O]nce the statutory requirements are met, a district court is free to grant discovery in its discretion.'"  Schmitz, 376 F.3d at 83-84 (quoting In re Metallgesellschaft AG, 121 F.3d 77, 78 (2d Cir. 1997)); see In re Edelman, 295 F.3d 171, 181 (2d Cir. 2002) ("Congress planned for district courts to exercise broad discretion over the issuance of discovery orders pursuant to § 1782(a) – both over whether to grant a discovery order and, if so, what limits to place on that discovery.") (citing S.Rep. No. 88–1580, § 9, reprinted in 1964 U.S.C.C.A.N. at 3788).  "This discretion, however, is not boundless.  Rather, we have held that 'district courts

7

must exercise their discretion under § 1782 in light of the twin aims of the statute:  providing

efficient means of assistance to participants in international litigation in our federal courts and

encouraging foreign countries by example to provide similar means of assistance to our

courts. . . .'" Schmitz, 376 F.3d at 84 (quoting In re Malev Hungarian Airlines, 964 F.2d 97, 100

(2d Cir. 1992)) (internal quotation marks omitted).

> In exercising this discretion, courts should consider:
>
> (1)     [w]hether the documents or testimony sought are within the foreign
>           tribunal's jurisdictional reach, and thus accessible absent § 1782 aid;
>
> (2)     [t]he nature of the foreign tribunal, the character of the proceedings
>           underway abroad, and the receptivity of the foreign government or the
>           court or agency abroad to U.S. federal-court judicial assistance;
>
> (3)     [w]hether the § 1782 request conceals a[n] attempt to circumvent foreign
>           proof-gathering restrictions or other policies of a foreign country or the
>           United States; and
>
> (4)     [w]hether the subpoena contains unduly intrusive or burdensome requests.

In re Microsoft Corp., 428 F. Supp. 2d 188, 192-93 (S.D.N.Y. 2006) (citing Intel Corp. v.

Advanced Micro Devices, Inc., 542 U.S. 241, 264-65 (2004)).

Here, "[a]s . . . frequently is the case in § 1782 proceedings, leave to serve the

subpoenas was granted ex parte, which is appropriate because all questions with respect to the

propriety of the grant of leave and with respect to the content [of] the subpoenas are available to

every subpoenaed party via a motion to quash or the defense of an application to compel

compliance with the subpoenas." In re Ex Parte Application of Porsche Automobil Holding SE

for an Order Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for Use in

Foreign Proceedings, No. 15-MC-417 (LAK), 2016 WL 702327, at *1 (S.D.N.Y. Feb. 18, 2016).

## II.      ANALYSIS

Movants contend that this Court should vacate its June 11, 2020 order because "Warren failed to disclose <u>Kiobel by Samkalden v. Cravath, Swaine & Moore LLP</u>, 895 F.3d 238 (2d Cir. 2018), which addresses the very type of discovery he seeks here – and denies it." (Mov. Br. (Dkt. No. 25) at 7)  Movants also contend that "Warren's Application is the product of impermissible forum shopping. . . . [H]e already made a motion in the Chapter 15 Proceeding seeking the discovery that Fintech and Seadrill produced there for his own use in the NAFTA arbitration that underlies his Application. . . . [C]ontrary to statements in his Application, he could have requested third-party discovery from the very NAFTA arbitral tribunal that presides over his arbitration."  (<u>Id.</u>)

### A.      Statutory Factors

It is undisputed here that Warren's application satisfies the statutory factors. Movants Fintech and Wilk Auslander were served in this District (<u>see</u> Concannon Decl. (Dkt. No. 30) ¶¶ 7-12); the discovery Warren seeks is for use in a foreign proceeding pending before the NAFTA Tribunal (<u>see</u> Orta Decl. (Dkt. No. 4) ¶¶ 12-15); and Warren is an "interested person" under Section 1782 insofar as he is a claimant in the proceeding before the NAFTA Tribunal.  (<u>Id.</u> ¶ 1)  This Court thus had the statutory authority to issue the <u>ex parte</u> order under Section 1782.  <u>See</u> <u>In re OOO Promnefstroy</u>, 2009 WL 3335608, at *4 (citing <u>Schmitz</u>, 376 F.3d at 83).

### B.      Discretionary Factors

Because the Section 1782 statutory factors are satisfied, this Court is "free to grant discovery in its discretion."  <u>Schmitz</u>, 376 F.3d at 83-84 (2d Cir. 2004) (quoting <u>In re Metallgesellschaft</u>, 121 F.3d at 78).  In determining whether its discretion was properly exercised

in this instance, however, this Court will consider anew the four factors listed by the Supreme

Court in <u>Intel Corp. v. Advanced Micro Devices, Inc.</u>, 542 U.S. 241 (2004), along with the

teaching of <u>Kiobel by Samkalden v. Cravath, Swaine & Moore LLP</u> ("Kiobel"), 895 F.3d 238

(2d Cir. 2018).

### 1.   Whether the Evidence Sought Is <br> <u>Available through the Foreign Tribunal</u>

In <u>Intel</u>, the Supreme Court explained that "when the person from whom

discovery is sought is a participant in the foreign proceeding . . . , the need for [Section] 1782(a)

aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant

in the matter arising abroad.  A foreign tribunal has jurisdiction over those appearing before it,

and can itself order them to produce evidence."  <u>Intel</u>, 542 U.S. at 264.

Here, Movants contend that "Warren could have sought third-party discovery in

the NAFTA Arbitration but did not. . . . [T]he [NAFTA Tribunal] Procedural Order dated March

25, 2019, states that '[f]or matters concerning the gathering or taking of evidence that are not

otherwise covered by a procedural order issued by the Tribunal, the UNCITRAL Rules or

NAFTA Chapter 11, the Tribunal may refer to the IBA Rules on the Taking of Evidence in

International Arbitration. . . .'"  (Mov. Br. (Dkt. No. 25) at 25)  "The relevant IBA rule (Art. 3.9)

requires that the party seeking discovery make a request to the tribunal before taking third-party

discovery."  (<u>Id.</u> at 26)

Warren counters that Movants "are <u>not</u> participants in the NAFTA Arbitration –

the only participants are the U.S. Shareholders (claimants) and México (respondent) . . . , which

favors exercising the Court's discretion to grant the Application."  (Warren Opp. Br. (Dkt. No.

29) at 18 (emphasis in original))  In this regard, Warren points out that – notwithstanding the

NAFTA Tribunal's incorporation of the IBA Rules, which appear to permit third-party discovery

– it is not clear that the NAFTA Tribunal has the power to compel third-party discovery.  (Id. at 27-28)  Warren cites In re Application of Chevron Corp., 709 F. Supp. 2d 283 (S.D.N.Y. 2010), as corrected (May 10, 2010), aff'd sub nom. Chevron Corp. v. Berlinger, 629 F.3d 297 (2d Cir. 2011), for the proposition that a foreign tribunal's inability to compel third-party discovery is a relevant consideration in resolving a Section 1782(a) application.  See id.  In granting the Section 1782(a) application in that case, the district court noted that "the arbitral tribunal lack[s] jurisdiction to compel [the discovery target] to produce the material."  Chevron, 709 F. Supp. 2d at 292.  Although Movants contend that more recent amendments to the IBA rules have somehow undermined Chevron (Mov. Br. (Dkt. No. 25) at 26), nothing in the IBA rules could give the NAFTA Tribunal jurisdiction over third-parties.

Movants also argue that Warren's application is "an end-run around the Bankruptcy Court's decision to adjourn Warren's [m]otion [for discovery]."  (Mov. Br. (Dkt. No. 25) at 25)  The relevant inquiry, however, is "[w]hether the documents or testimony sought are within the foreign tribunal's jurisdictional reach," not whether they are within the jurisdictional reach of some other court.  In re Microsoft Corp., 428 F. Supp. 2d at 192 (emphasis added).

The Court concludes that analysis of the first Intel factor supports Warren's application.

### 2.    Whether the NAFTA Tribunal Will Be Receptive to Judicial Assistance From This Court

Under the second Intel factor, courts consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court agency abroad to U.S. federal-court judicial assistance."  Intel, 542 U.S. at 264.

Warren argues that "tribunals routinely accept third-party evidence, including that obtained from Section 1782 proceedings," pursuant to the UNCITRAL Arbitration Rules under

which the NAFTA Tribunal is constituted.  (Warren App. Br. (Dkt. No. 3) at 31)  Movants do

not dispute Warren's assertion.  Moreover, "courts generally should err on the side of permitting

the requested [Section 1782] discovery" unless there is "authoritative proof" that the foreign

tribunal would not accept the discovery.  In re Application of Gemeinshcaftspraxis Dr. Med.

Schottdorf, No. CIV.M19-88 BSJ, 2006 WL 3844464, at *6 (S.D.N.Y. Dec. 29, 2006); see also

In re Levy, 249 F.R.D. 96, 107 (S.D.N.Y. 2008) (ordering discovery pursuant to Section 1782 in

a case "where the foreign forums have [not] been expressly unreceptive to an American court's

intercession").

> Analysis of the second Intel factor favors granting Warren's application.

### 3.     Whether Warren's Application Is an Attempt<br>to Circumvent Foreign Proof-Gathering Restrictions

> Under the third Intel factor, courts "consider whether the [Section] 1782(a)

request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of

a foreign country or the United States."  Intel, 542 U.S. at 265.

> Citing IBA Article 3.9, Movants argue that Warren "seeks to avoid the

requirements set forth in the IBA Rules for third party discovery."  According to Movants,

Article 3.9 "instructs the Arbitration parties seeking third-party discovery to request it from the

Tribunal."  (Mov. Reply Br. (Dkt. No. 26) at 10-12)

> Warren counters that "because neither [Movants], nor Wilk's client, are parties to

the NAFTA Arbitration, the concern . . . about circumventing foreign proof-gathering restrictions

simply does not exist here."  (Warren Opp. Br. (Dkt. No. 29) at 19)

> IBA Article 3.9 provides:

> If a Party wishes to obtain the production of Documents from a person or
> organisation who is not a Party to the arbitration and from whom the Party cannot
> obtain the Documents on its own, the Party may, within the time ordered by the

> Arbitral Tribunal, ask it to take whatever steps are legally available to obtain the requested Documents, or seek leave from the Arbitral Tribunal to take such steps itself.  The Party shall submit such request to the Arbitral Tribunal and to the other Parties in writing, and the request shall contain the particulars set forth in Article 3.3, as applicable.  The Arbitral Tribunal shall decide on this request and shall take, authorize the requesting Party to take, or order any other Party to take, such steps as the Arbitral Tribunal considers appropriate if, in its discretion, it determines that (i) the Documents would be relevant to the case and material to its outcome, (ii) the requirements of Article 3.3, as applicable, have been satisfied and (iii) none of the reasons for objection set forth in Article 9.2 applies.

International Bar Association Council, IBA Rules on the Taking of Evidence in International Arbitration, Art. 3.9 (2010).

By its terms, IBA Article 3.9 applies to Warren's attempt to obtain documents from Fintech and Wilk Auslander.  The Court also notes that there is no evidence that Warren has sought leave from the Arbitral Tribunal to seek discovery under Section 1782(a).  The Court acknowledges, however, that in stating that a party may "ask [the Arbitral Tribunal] to take whatever steps are legally available to obtain the requested Documents," the rule appears to acknowledge that the Arbitral Tribunal's ability to compel a non-party to produce documents may be limited.  In sum, the Court concludes that Warren has not made use of IBA Article 3.9 in seeking to obtain documents from Movants, but also takes notes of the practical reality that the Arbitral Tribunal has no power to compel third- parties such as Movants to produce documents in connection with the arbitration.  Given that Movants have resisted producing documents in the instant proceeding, there is no reason to believe that they would comply with a request for documents authorized by the Arbitral Tribunal.

The Second Circuit has cautioned "that the availability of the discovery in the foreign proceeding should not be afforded undue weight"; "'discovery pursuant to § 1782 [may not be denied] solely because such discovery is unavailable in the foreign court[.]'"  Mees v.

Buiter, 793 F.3d 291, 303 (2d Cir. 2015) (quoting Metallgesellschaft, 121 F.3d at 79)  The court

described the proper analysis as follows:

> There is some apparent tension in the precedent of the Supreme Court and this
> Court instructing that a § 1782 application should not be rejected on the ground
> that the discovery would not be available in the foreign proceedings, but that a
> district court should consider "whether the § 1782(a) request conceals an attempt
> to circumvent foreign proof-gathering restrictions or other policies of a foreign
> country," Intel, 542 U.S. at 265, 124 S.Ct. 2466.  But these instructions, properly
> understood, are not inconsistent.  That a country does not enable broad discovery
> within a litigation does not mean that it has a policy that restricts parties from
> obtaining evidence through other lawful means.  "[P]roof-gathering restrictions"
> are best understood as rules akin to privileges that prohibit the acquisition or use
> of certain materials, rather than as rules that fail to facilitate investigation of
> claims by empowering parties to require their adversarial and non-party witnesses
> to provide information.  Courts may also consider whether the "nature, attitude
> and procedures of that jurisdiction," Brandi-Dohrn [v. IKB Deutsche
> Industriebank AG, 673 F.3d 76, 80-81 (2d Cir.2012)] (internal quotation marks
> omitted), indicate that it is receptive to assistance under § 1782, even if it does not
> provide for similar discovery itself.  Thus, "authoritative proof that a foreign
> tribunal would reject evidence obtained with the aid of § 1782 . . . would provide
> helpful and appropriate guidance to a district court in the exercise of its
> discretion." Euromepa [S.A. v. R. Esmerian, Inc., 51 F.3d 1095, 1100 (2d
> Cir.1995)].  Here, however, Buiter does not contend that Dutch courts reject the
> use in litigation of materials obtained through § 1782.

Id. at 303 n.20.

Here, to the extent that IBA Article 3.9 requires a party seeking third-party

discovery to request assistance from the Tribunal – or leave to pursue the documents on its own

– that rule is best understood as one that "fail[]s to facilitate" discovery from third parties, rather

than as a proof-gathering restriction.  As in Mees, Movants do not contend that the NAFTA

Tribunal would refuse to consider evidence obtained through Warren's Section 1782(a)

application.  Accordingly, while the Court concludes that Warren has not complied with IBA

Article 3.9, the significance of that non-compliance is tempered by the practical reality that the

Arbitral Tribunal has no power to compel Movants to produce documents, and there is no reason

to believe that Movants would voluntarily comply with any request made or authorized by the

Arbitral Tribunal to produce the requested documents.

### 4. Whether Warren's Discovery Requests Are Unduly Intrusive or Burdensome

The final Intel factor requires a court to consider "[w]hether the subpoena

contains unduly intrusive or burdensome requests."  In re Microsoft Corp., 428 F. Supp. 2d at

193 (citing Intel, 542 U.S. at 264-65).  Citing Kiobel, Movants contend that Warren's subpoenas

are "unduly intrusive or burdensome" because they (1) "seek documents and information that are

subject to a strict confidentiality order;" (2) "attempt to obtain the confidential documents and

information of a foreign corporation through its New York counsel"; and (3) "seek information

Warren already sought in a different Court, in an action that has been stayed."[4]  (Mov. Br. (Dkt.

No. 25) at 18)

Warren responds that Kiobel is distinguishable on several grounds:  (1) "it is

undisputed that [Movants] are not participants in the NAFTA Arbitration"; (2) "[Movants] do

not claim that Mr. Warren is attempting to circumvent NAFTA rules"; and (3) this Court's June

11, 2020 order "has not overridden the protective order and the NAFTA Tribunal will safeguard

confidentiality."  (Warren Opp. Br. (Dkt. No. 29) at 18-20 (emphasis in original))

In Kiobel, an individual litigating against Royal Dutch Shell ("Shell") in the

Netherlands petitioned a court in this District under 28 U.S.C. § 1782 to subpoena documents

from Cravath, Swaine & Moore LLP ("Cravath"), which was "holding the documents because it

represented Shell in prior litigation brought by Kiobel against Shell in that district."  Kiobel, 895

F.3d at 240.  The subpoena sought documents that "were subject to a stipulated confidentiality

---

[4]  Movants note that while "the [s]ubpoenas are broader than the discovery allowed in the Chapter 15 Proceeding . . . [,] they do not seek vacatur or reconsideration of the [June 11, 2020] Order on that basis."  (Mov. Reply. Br. (Dkt. No. 26) at 13)

order entered into in the [prior litigation], and signed by Kiobel. Most of the documents produced by Shell were marked 'confidential,' meaning that they were to be used 'solely for purposes' of the then-pending . . . litigation[]." Id. at 241. The Second Circuit held that the district court had abused its discretion in granting Kiobel's Section 1782(a) application. Id. at 240-41, 248.

The Second Circuit's reversal in Kiobel is premised on several factors. The court first notes that "the combination of the confidentiality order and the more restrictive Dutch discovery practices makes the documents at issue undiscoverable from Shell in the Netherlands." Id. at 246. Citing the "'strong presumption against the modification of a protective order,'" the court then rules that "[t]he decision to alter the confidentiality order without Shell's participation, and without considering the costs of disclosure to Shell, makes this case exceptional, and mandates reversal." Id. at 247 (quoting S.E.C. v. TheStreet.Com, 273 F.3d 222, 229 (2d Cir. 2001)). The Second Circuit also observes that "Kiobel did not (presumably because she cannot) provide the U.S. courts with assurance that Dutch courts will enforce the protective orders that safeguard the confidentiality of Shell's documents." Id.

Warren did not cite Kiobel in his Section 1782(a) application, and he now argues that Kiobel "has no application here[,] [because he] satisfies the first and third Intel factors[.]" (Warren Opp. Br. (Dkt. No. 29) at 16) Warren also contends that the Chapter 15 court's Protective Order "does not preclude the use of the discovery produced in the Chapter 15 Proceeding in the NAFTA Arbitration." (Warren Opp. Br. (Dkt. No. 29) at 12)

The Chapter 15 court's Protective Order states that

[a]ll Discovery Material, whether Designated Material or Non-Designated Material, shall be used by the Receiving Parties solely for the purposes of the Disputes and not for any other purpose. For the avoidance of doubt, the disclosure of Discovery Material by the Receiving Parties to any person shall be

prohibited unless otherwise permitted by this Order or agreed to by the Parties in writing.

(Protective Order (Dkt. No. 24-4) ¶ 9)  The party that received discovery materials from Fintech in the Chapter 15 proceeding was Oro Negro's Foreign Representative.  (Id. at 2)

The circumstances in Kiobel are somewhat different from the circumstances here. In Kiobel, Kiobel was suing Shell in the Netherlands and sought – pursuant to Section 1782(a) – documents from Cravath that had been produced by Shell to Cravath in connection with Kiobel's earlier U.S. litigation against Shell.  Kiobel, 895 F.3d at 241.  Cravath produced those documents to Kiobel pursuant to a protective order that restricted their use to Kiobel's U.S. litigation against Shell.  Id.  Kiobel was a signatory to the stipulated protective order.  Id.  The sole reason that Cravath had custody of Shell's documents was its representation of Shell in connection with Kiobel's U.S. litigation against Shell.  Id. at 240.  "Kiobel did not subpoena Shell, only Cravath." Id. at 242.  Finally, Shell was deprived of its right to enforce the protective order it had obtained in its earlier, U.S. litigation against Kiobel.  Id.

In ruling that the District Court had abused its discretion in granting Kiobel's Section 1782(a) application, the Second Circuit explained, inter alia, that "an order compelling American counsel to deliver documents that would not be discoverable abroad, and that are in counsel's hands solely because they were sent to the United States for the purpose of American litigation, would jeopardize 'the policy of promoting open communications between lawyers and their clients.'"  Id. at 241 (quoting Application of Sarrio, S.A., 119 F.3d 143, 146 (2d Cir. 1997).

Here, to the extent that Warren seeks Fintech documents directly from Fintech, a U.S. entity, Kiobel is not on point.  As Warren observes, "[w]hatever concerns about attorney-client communications that might apply to Wilk in its capacity as a Discovery Target producing Seadrill's documents . . . clearly do not apply to Fintech, which is directly subject to [this Court's

17

June 11, 2020 Order]."  (Warren Opp. Br. (Dkt. No. 29) at 24)  Movants have no counter to this argument.  Moreover, this Court does not understand Warren to be seeking documents that Fintech obtained through or as a result of the Chapter 15 litigation.  And, unlike Kiobel, Warren is not a signatory to the protective order issued by the Chapter 15 court and is not bound by that order.  Finally, Fintech's disclosure of its own documents is not restricted by the protective order issued by the Chapter 15 court.  For all these reasons, Movants' motion to vacate this Court's June 11, 2020 Order will, as to Fintech, be denied.

To the extent that Warren seeks to obtain Seadrill documents from its counsel, Wilk Auslander, the circumstances are more analogous to those in Kiobel.  Like Cravath in Kiobel, Wilk Auslander came into possession of Seadrill's documents solely as a result of its representation of Seadrill in connection with the Chapter 15 proceeding.  Seadrill, like Shell, is a foreign entity, and Wilk Auslander is its U.S. counsel.  Moreover, to the extent that Seadrill produced its documents to Wilk Auslander with the understanding that those documents would be subject to a protective order, Seadrill's reasonable expectation would be defeated were this Court to order discovery from Wilk Auslander pursuant to Section 1782(a).  In sum, the primary concern that motivated the Kiobel court – that documents of a foreign entity would become discoverable under Section 1782(a) solely because they were produced by the foreign entity to its U.S. counsel in connection with U.S. litigation – is present here, and counsels that this Court's June 11, 2020 Order should be vacated.

While Warren contends that (1) "neither of [Movants], nor Wilk's client, Seadrill, is a party to the NAFTA Arbitration," and (2) "Warren is not attempting to circumvent foreign proof-gathering policies" (Warren Opp. Br. (Dkt. No. 29) at 21), these arguments are not responsive to the concerns expressed in Kiobel.  And given that Seadrill is not a party to the

NAFTA Arbitration, there is no reason to believe that its interest in confidentiality will be protected in that proceeding.

Warren contends, however, that he "can provide assurances regarding enforcement of the Protective Order that Kiobel could not," because "the parties in the NAFTA Arbitration entered into their own confidentiality order that (1) expressly contemplates that evidence from other proceedings may be exchanged between the parties, and (2) provides that to the extent such evidence is subject to a confidentiality order, it will remain subject to that order." (Warren Opp. Br. (Dkt. No. 29) at 22-23)

Movants respond that these "assurances" are "empty" for three reasons:  (1) it "is impossible for the Arbitration parties and Tribunal to abide by the terms of the [Chapter 15 court's Protective Order] because it expressly prohibits dissemination of Chapter 15 Discovery to them"; (2) "[Movants], which are not parties to the Arbitration, will have no way to monitor whether the Arbitration parties are keeping the discovery confidential and no way to enforce confidentiality"; and (3) "the Procedural Order on which Warren relies shows that . . . '[a]ny order, decisions, interim or partial awards, as well as the final award, issued by the Tribunal' may be published online . . . ."  (Mov. Reply Br. (Dkt. No. 26) at 8-9 (quoting Mar. 25, 2019 NAFTA Procedural Order (Dkt. No. 4-3) ¶ 25.2))

This Court concludes, as to Wilk Auslander, that Warren has not meaningfully addressed the concerns expressed in Kiobel.  The Kiobel court expressed concern that "the Dutch courts [would not] enforce the protective orders that safeguard the confidentiality of Shell's documents."  Kiobel, 895 F.3d at 247.  Similarly, here, while the NAFTA Tribunal has provisions for maintaining as confidential discovery materials that are subject to a protective order, it is apparent that these provisions offer limited protection, given that awards and

decisions may be published online.  (Mar. 25, 2019 NAFTA Procedural Order (Dkt. No. 4-3) ¶
25.2)

Moreover, because Wilk Auslander and its client are not parties to the arbitration,
they have no effective means to monitor the parties' compliance with any agreement, Tribunal
rule, or Tribunal order concerning confidentiality, and no effective means to obtain relief for a
violation.  Given that (1) respondent Mexico owns and controls Pemex, SeaMex's principal
customer, and (2) there are "25 other claimants" in the NAFTA proceeding (Mov. Reply Br.
(Dkt. No. 26) at 9), Seadrill and its subsidiary SeaMex have legitimate concerns regarding the
confidentiality of Seadrill's documents.

Warren further argues that Kiobel is distinguishable because – unlike in Kiobel –
the first and third Intel factors are satisfied here.  (Warren Opp. Br. (Dkt. No. 29) at 18-20)  This
argument is not persuasive, because Kiobel is premised on the fourth Intel factor.  See Kiobel,
895 F.3d at 247 (citing cases addressing the fourth Intel factor).  Indeed, while the Kiobel court
addressed the first and third Intel factors in its analysis, the court determined that it was the facts
regarding the fourth Intel factor that "make[] this case exceptional, and mandate[] reversal."  Id.
The same reasoning applies with equal force to Wilk Auslander and the documents it holds on
behalf of Seadrill.

Finally, Warren claims that "because the discovery at issue here is not
'undiscoverable' abroad, the concerns that the Kiobel court had about inhibiting attorney-client
communications do not apply here."  (Warren Opp. Br. (Dkt. No. 29) at 24)  This distinction is
irrelevant because, while the discovery sought is not undiscoverable in the NAFTA Arbitration
by reason of a NAFTA rule, Warren's application – as well as this Court's analysis of the first
Intel factor – is premised on the proposition that "a NAFTA arbitration tribunal does not have

authority to compel third parties to produce discovery." (Warren App. Br. (Dkt. No. 3) at 30)
Accordingly, the concerns about inhibiting attorney-client communication apply with equal force
here.

The Court concludes that <u>Kiobel</u> requires that the June 11, 2020 Order be vacated
as to Wilk Auslander.

## **CONCLUSION**

For the reasons stated above, Movants' motion to vacate this Court's June 11,
2020 Order is granted as to Wilk Auslander but denied as to Fintech.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 23, 25).

Dated:  New York, New York
        October 21, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge